UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| THE ESTATE OF BRIAN PERRY, by its | ) | |
| administrator RODNEY W. PERRY, and | ) | |
| Minor Children JP, MP, and BP | ) | |
| by and through their next friend CARL PERRY, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-1153-LJM-WTL |
| | ) | |
| BOONE COUNTY SHERIFF, | ) | |
| BOONE COUNTY JAIL COMMANDER | ) | |
| TERESA BRANNON, | ) | |
| SHERIFF DENNIS M. BRANNON, and | ) | |
| DR. PATRICK DOOLAN, | ) | |
| Defendants. | ) | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on motions for summary judgment filed by Defendants Boone

County Sheriff ("the Sheriff"), Boone County Jail Commander Teresa Brannon ("Teresa Brannon"),

and Sheriff Dennis M. Brannon ("Dennis M. Brannon"), and by Defendant Dr. Patrick Doolan ("Dr.

Doolan") (all defendants collectively, "Defendants").  Plaintiffs, the Estate of Brian Perry, by its

administrator Rodney W. Perry ("the Estate"), and Minor Children JP, MP, and BP by and through

their next friend Carl Perry ("the Minor Children") (the plaintiffs collectively, "Plaintiffs"), filed this

action following the death of Brian Perry ("Perry") from seizures related to alcohol withdrawal and

delirium tremens ("DTs") while Perry was being held in custody at the Boone County Jail.  Plaintiffs

seek relief under 42 U.S.C. § 1983 and under state law.  The motions for summary judgment have

been fully briefed and are ripe for ruling.

For the reasons explained herein, both motions are **GRANTED in part and DENIED in part**.

## I.  PRELIMINARY EVIDENTIARY MATTERS

As an initial matter, the Court addresses certain evidentiary matters raised by the parties. Because the bulk of these concerns arise in Plaintiffs' Surreply, the Court begins there.

Plaintiffs' Surreply makes several arguments regarding the testimony of medical doctors. Specifically, Plaintiffs contend that the Court should strike the materials related to Dr. Timothy Kelly ("Dr. Kelly") because he was not timely identified as an expert under the case management plan, that the Court should either strike or give no weight to the opinions of Dr. Charles Hatcher ("Dr. Hatcher") because they are not based upon the relevant facts of this case and are inherently unreliable, and that the Sheriff has taken the testimony of Dr. Fred W. Frick ("Dr. Frick") out of context.

With respect to Dr. Kelly, the Court is unpersuaded with Plaintiffs' argument that the materials should be struck.  Contrary to Plaintiffs' contention, the Court finds that the expert designation was timely.  At the joint request of the parties, the Court amended the Case Management Plan setting deadlines of April 4, 2007, for Defendants to designate their experts and June 4, 2007, to complete expert discovery.  *See* February 9, 2007, Order (Docket No. 60).  Thereafter, Plaintiffs received multiple extensions of time to respond to the motions for summary judgment, in part to complete the depositions of the doctors.  *See* April 25, 2007, Order (Docket No. 70); June 11, 2007, Order (Docket No. 76); June 28, 2007, Order (Docket No. 78); July 6, 2007, Order (Docket No. 80). Plaintiffs' combined response to the motions for summary judgment was ultimately filed on July 9,

2

2007. The transcripts of the depositions reveal that Dr. Kelly was deposed on May 10, 2007. Thus, Plaintiffs had Dr. Kelly's testimony available to them when they prepared their response. Under these circumstances, Plaintiffs have failed to demonstrate that the designation was untimely, much more how they are now prejudiced by inclusion of the materials. Therefore, the motion to strike Dr. Kelly's testimony is **DENIED**.

Similarly, the Court is unpersuaded by Plaintiffs' arguments related to Dr. Hatcher's opinions. Contrary to Plaintiffs' suggestion, Dr. Hatcher has not opined that a person experiencing a severe case of DTs while incarcerated does not need to be transported to a hospital for treatment. Instead, Dr. Hatcher acknowledged that a person who is agitated, confused, and disoriented could be suffering from a condition other than DTs that might not require immediate hospitalization. Plaintiffs' contentions about Dr. Hatcher's opinions really go to Dr. Hatcher's credibility and how much weight should be given to those opinions, arguments that are better suited for trial. Therefore, the request to strike or disregard Dr. Hatcher's opinions is **DENIED**.

Finally, Plaintiffs' contention that the Sheriff has taken Dr. Frick's testimony out of context is perplexing. The Sheriff notes that Dr. Frick has essentially conceded that a person exhibiting signs of agitation, incoherence, and fighting with invisible persons could be experiencing a condition other than DTs. In opposition to the Sheriff's tactic, Plaintiffs explicitly quote Dr. Frick's testimony where he agrees with defense counsel's question that these signs do not "necessarily indicate the onset of DTs" by stating that "[i]t could indicate something else." Frick Dep. at 16. In light of the straightforward testimony, the Court finds that the Sheriff has not taken Dr. Frick's testimony out of context. To the extent that Plaintiffs want to argue something different about this aspect of Dr. Frick's testimony, that is something to address in an opening statement or closing argument or to

3

bring out during examination of Dr. Frick.  However, the Court is unpersuaded that any action against the Sheriff for his characterization of Dr. Frick's testimony is warranted at this juncture.

Having disposed of Plaintiffs' concerns, the Court turns to the Sheriff's argument raised in his Reply Brief.  The Sheriff contends the Court should strike a hand-written conclusion contained in the affidavit of a former detainee, Leslie G. Mallo ("Mallo"), who was confined when Perry died at the jail.  *See* Sheriff's Reply Br. at 10-11 (Docket No. 93).  Mallo specifically averred that "I firmly believe Brian Perry died due to lack of medical attention." Mallo Aff.  The Sheriff argues that Mallo's conclusion is an inadmissible lay opinion under Federal Rule Evidence 701.  Even though Plaintiffs raised several evidentiary arguments in their Surreply, Plaintiffs opted not respond to this particular argument.  The Court takes Plaintiffs' silence as an admission that the lay opinions are inadmissible and, accordingly, **GRANTS** the request to strike the conclusions.  Therefore, the Court will not consider Mallo's conclusion, although the rest of the affidavit is relevant and will be considered.

## II. <u>BACKGROUND</u>

Because Plaintiffs have not explicitly disputed the majority of the facts, the Court notes the facts listed in the Defendants' briefs.[1]  Those facts are as follows:

---

[1]  In their combined response to the motions for summary judgment, Plaintiffs do not specifically delineate the material facts that are in dispute.  Instead, they simply repeat their statement of issues.  *See* Pls.' Memo. in Resp. at vii and 29.  This is contrary to the requirements of Local Rule 56.1(b).  Notwithstanding Plaintiffs' failure to comply with the local rules, the Court has taken note of those circumstances revealed by the arguments in the briefs to be disputed or additional facts.

### A.  TRAINING POLICIES AND MEDICAL PROCEDURES

The Boone County Jail operated pursuant to a written medical policy contained within its procedures manual.  Brannon Aff., ¶ 1 & Exs. A-B.  Dr. Doolan reviewed and approved the medical policy for the jail.  *Id.*, ¶ 2 & Ex. D; Doolan Dep. at 130-32.  Jail officers were expected to read and follow the policy, although at least one officer involved in the circumstances of this case indicated that he was never told to read the manual and that his understanding was to listen instructions of the Sheriff and Jail Commander.  Rolston Dep. at 24, 28; Vernon Dep. at 33, 55.  The medical policy includes a section on medical treatment for those undergoing alcohol withdrawal and recognizes that withdrawal is a serious medical condition that can result in death if not properly treated.  Doolan Dep. at 90; Branon Dep. at 45-46; Teresa Brannon Dep. at 15.  Officers are also instructed to have detainees transported to a hospital if they see signs of delirium tremens ("DTs").  Doolan Dep. at 89-90, 93.  DTs is a late stage of alcohol withdrawal evidenced by hallucinations, delusions, and tremors.  Doolan Dep. at 63-64.

In addition to the medical policy, all officers hired by the Sheriff are required to take the jail officers' training course offered through the Indiana Law Enforcement Academy and become certified as jail officers after completion of the course.  They also receive on-the-job training while employed at the jail, which includes training and instruction on administering medication and CPR.  Brannon Aff., ¶ 6.  Dr. Doolan instructed the officers about the proper first responder tests of checking the airway, breathing, and blood circulation and about triaging the medical conditions of detainees.  Doolan Dep. at 19, 28-29; Teresa Brannon Dep. at 12-14.  He would also periodically go over specific medical issues with jail officers.  Teresa Brannon Dep at 12-14.  However, some of the officers involved in the incident in this case indicated that they never had any individualized training

on medical issues or on recognizing people undergoing alcohol withdrawal.  Vernon Dep. at 11-12; Rolston Dep. at 9.

Dr. Doolan came to jail once a week on Wednesdays to see detainees and was available twenty-four hours a day to receive calls concerning medical issues.  Brannon aff., ¶ 2; Doolan Dep. at 132.  Officers were instructed to call Dr. Doolan concerning medical issues and to call 911 for an ambulance if an inmate was undergoing seizures, convulsions, or actively bleeding, or if the detainee displayed other conditions that would require immediate emergency care.  Brannon Aff., ¶ 4; Rolston Dep. at 8-9; Teresa Brannon Dep. at 18, 35, 41-42.

Prior to Perry's death, no other detainee is known to have died or sustained serious injury due to a failure to secure medical attention at the Boone County Jail.  Brannon aff., ¶ 5.  The only other death at the jail occurred eight months later in December 2004.  Dennis Brannon Ans. to Interrogs. at 16.

## B.  PERRY'S CONFINEMENT AND TREATMENT

Perry was a known alcoholic with prior alcohol-related arrests.  Vernon Dep. at 12-14; Teresa Brannon Dep at 26; Doolan Dep. at 40, 85.  Perry was thirty-four years old and had three small children at the time of this death.  A. Perry Dep. at 8-9, 79; Perry Booking Form at 1.

On April 1, 2004, Perry was arrested and booked for operating a vehicle while intoxicated, resisting law enforcement, and on an open warrant for a probation violation.  Pestow Aff., ¶ 2; Vernon Aff., ¶ 2.  Perry was offered a portable breath test to measure his blood alcohol content ("BAC") because the jail would not accept individuals who had a BAC in excess of 0.25.  In such a case, the arresting officer would have to take the arrestee to the hospital to be checked out for any

6

medical condition that could result from excessive alcohol consumption.  Vernon Aff., ¶ 3.  Perry refused to take any test, and so jail officer Dan Vernon ("Vernon") concluded that he could not refuse to admit Perry.  Vernon Aff., ¶ 4.

During the booking process, Perry answered most of the initial screening questions, stood on his own, and spoke with the jail officers.  He did not display any signs of shaking, trembling, or seizures.  Vernon Aff., ¶ 2 and Ex. A; Pestow Aff., ¶ 4.  Based on Perry's prior arrests, jail officers noted on the book-in sheet that Perry experienced "Very Bad DTs from Alcohol."  Perry Booking Form at 2.  Perry was placed in a holding cell after booking and he went to sleep.  Vernon Aff., ¶ 6; Jon Scott Aff., ¶ 2; Pestow Aff., ¶ 6.  At that time, he was not displaying any behavior or condition that caused the jail officers to think that Perry needed medical attention.  *Id.*

The next day, April 2, during the second shift that ran between 2:00 p.m. and 10:00 p.m., jail officer Angela Sanders ("Sanders") delivered Perry's dinner tray and observed that Perry was in a good mood and joking about being drunk when he was arrested.  Sanders Aff., ¶ 3.  However, around 8:30 p.m., Sanders saw Perry go into a seizure and she entered Perry's cell and requested that medics be summoned.  *Id.*  Perry's seizure lasted about a minute.  Afterward, Perry said that he was fine and that he did not need medical attention, and he told the medics that he did not want to go to the hospital.  Sanders Aff., ¶ 3; Pestow Aff., ¶ 7.  Sanders told the medics to take Perry to the hospital anyway to be checked out.  *Id.*  Perry was later released and returned to the jail.

The next morning around 7:00 a.m., jail officer Scott Rolston ("Rolston") issued the breakfast trays.  When he came to Perry's cell, he asked Perry how he was and Perry reported that he was fine.  Perry seemed alert with normal speech and voiced no complaints.  Rolston Aff., ¶ 2.  A few minutes later, Rolston heard loud noises coming from Perry's cell and saw Perry shaking like

he was having a seizure.  *Id.*  Rolston requested paramedics and asked for jail officer Justin Clawson ("Clawson") to come to the cell.  When Clawson arrived, Perry had pulled his blanket over his head.  *Id.*; Clawson Aff., ¶ 4.

Rolston and Clawson entered Perry's cell, removed the blanket, and spoke with Perry.  Rolston Aff., ¶¶ 2-3.  Within thirty seconds Perry stopped shaking and was coherent.  Rolston Aff., ¶ 3.  When the paramedics arrived at 7:09 a.m., Perry was calm and said that he did not want to go to the hospital.  *Id.*  However, just like the day before, Perry was transported to the hospital.  Rolston Aff., ¶ 3; Clawson Aff., ¶ 4.

Perry returned to jail later that morning around 8:28 a.m. and said that he was fine.  Rolston Aff., ¶ 4.  Perry went back to his cell and slept.  Clawson Aff., ¶ 5.  Perry had been prescribed two prescriptions from the hospital, one for Dilantin and one for Keflex.  Rolston Aff., ¶ 4.  Rolston was instructed to give Perry Dilantin at 1:00 p.m., but Rolston could wait until later in the day to give Perry Keflex.  *Id.*  Rolston then gave Perry the Dilantin at 1:00 p.m.  *Id.*, ¶ 5; Clawson Aff., ¶ 5.  In addition, the camera in Perry's cell was turned on and Rolston advised dispatch to display the image on a twenty-seven inch television screen.  Rolston Aff., ¶ 4.  Jail officers then observed Perry visually and on monitor every fifteen minutes for the rest of the first shift and noted that Perry was speaking in a coherent manner.  *Id.*, ¶ 5; Clawson Aff., ¶ 5.

Sanders returned for the second shift from 2:00 p.m. to 10:00 p.m. on April 3, 2004.  She was advised that Perry had experienced a second seizure and had returned from the hospital with prescriptions.  Sanders Aff., ¶ 4.  Sanders observed that Perry was speaking, appeared to be jovial, and said that he felt fine.  *Id.*  At the end of the second shift, Perry appeared normal and told one of the officers goodbye.  Vernon Aff., ¶ 7.

8

Apparently, Perry's condition changed during the night because when Rolston and Clawson returned for the 6:00 a.m. to 2:00 p.m. shift on April 4, 2004, they were told that Perry had been moved to a padded cell because he was ripping down ceiling tiles. Clawson Aff., ¶ 6; Rolston Aff., ¶ 6. During this event, Perry had stated something about needing a key to let the man in his cell out. Rady Email. When they arrived, Rolston and Clawson saw Perry walking around in his cell. Clawson Aff., ¶ 6; Rolston Aff., ¶ 6. Around 7:00 a.m., they tried to give Perry his medication but Perry refused. Rolston Aff, ¶ 6. Because of Perry's behavior, the jail officers requested that Dr. Doolan be paged. *Id.*; Clawson Aff., ¶ 6.

When Dr. Doolan returned the page, Rolston explained that Perry was agitated, had to be placed in a padded cell, had been to the hospital twice after seizures, and would not take his medication but was requesting Xanax. Doolan Dep. at 48-49, 58-60; Rolston Aff., ¶ 7. The jail officers also testified that they explained in detail Perry's condition, including his behavior, such as hitting and kicking the walls, talking to people, and being incoherent. Rolston Vol. Stmt.; Rolston Dep. at 33; Vernon Dep. at 20-21, 45, 52, 65-66.

Dr. Doolan disputes that the officers told him anything about Perry being incoherent, delusional, or hallucinating. Doolan Dep. at 50. 53-54, 67-69, 103-10, 117-18. He testified that the officers' statements in that regard are very damning and that he would have ordered that Perry be transported to a hospital right away had he known that Perry displayed some of the behaviors in the jail officers' written reports. Doolan Dep. at 65, 103-11, 137. In fact, Dr. Doolan stated that if Perry was exhibiting some of the claimed behaviors, the jail officers should have acted consistent with policy and transported Perry without even calling him. Doolan Dep. at 67-69, 103-09.

In any event, Dr. Doolan did not order that Perry be transported to the hospital.  Instead, he instructed Rolston to ask Perry if Perry would take Valium, and Perry indicated that he would take Valium and did not want to take Dilantin.  Doolan Dep. at 52.  According to Dr. Doolan, Perry sounded lucid during the phone exchange and did not sound as if he were undergoing DTs.  Doolan Dep. at 65-66.

Dr. Doolan then prescribed Valium, which he knew had been an effective medication for Perry's alcohol problem during prior incarcerations in the jail in 2002.  Doolan Dep. at 40, 133-34, 158-64 and Ex. D.  Around 11:40 a.m., shortly after the prescription was filled by a pharmacy, both Rolston and Clawson entered Perry's cell and tried to get him to take the Valium.  Rolston Aff., ¶ 7; Clawson  Aff., ¶ 6.  Perry drank the glass of water he was offered with the medicine but refused to take the Valium, stating that he did not believe in taking medication.  *Id.*  However, Perry asked for and received more water, drinking two or three glasses at that time.  *Id.*

Perry was restless the rest of the shift but was not shaking.  *Id.*  Rolston and Clawson notified the next shift of the events that had transpired, including Perry's refusal of medication.  Rolston Aff., ¶¶ 7-8; Clawon Aff., ¶ 6.  Sometime during the next shift, Perry yelled from the door of his padded cell.  Sanders Aff., ¶ 5.  Vernon tried to talk to Perry but Perry was not making any sense.  Vernon Aff., ¶ 8.  Because the Sheriff and Jail Commander were on vacation, Sanders and Vernon contacted Lt. Mike Beard ("Lt. Beard") and asked him to come to the jail because they were concerned that Perry might have another seizure based on Perry's yelling and irate behavior.  Sanders Aff., ¶ 5; Vernon Aff., ¶ 8.  They also thought that Lt. Beard might be able to convince Perry to take his medication.  Vernon Aff., ¶ 8.

Lt. Beard stopped at the jail around 2:40 p.m. and was advised that Perry was refusing to take his medication and had been transported to the hospital on two occasions for seizures. Vernon Aff., ¶ 8; Beard Aff., ¶ 2. Lt. Beard then entered Perry's cell and, after speaking with Perry, convinced him to take his medication with a full glass of water. Beard Aff., ¶ 2. Lt. Beard recalls that Perry was coherent and able to engage in conversation at that time. *Id.*

Sometime after Lt. Beard left, Perry put his face next to the floor in the padded cell and spit up the Valium. Sanders Aff., ¶ 5. Lt. Beard was called again at 5:25 p.m. and informed of this event and that Perry was "causing trouble." Beard Aff., ¶ 3. Lt. Beard instructed the jail officers to contact Dr. Doolan and to request road deputies to assist in moving Perry if necessary. *Id.* Vernon contacted Dr. Doolan at 5:54 p.m. and described Perry's behavior, which consisted of yelling and fighting with unknown persons in his cell. Vernon Aff., ¶ 9. Dr. Doolan told Vernon to give Perry two 10 milligram Valiums to replace the one that Perry spit up, and the jail officers complied with that directive. Sanders Aff., ¶ 6; Vernon Aff., ¶ 9; Vernon Dep. at 24.

Because Perry had been kicking the walls, the jail officers decided to put him in a restraint chair to keep Perry from hurting himself. Sanders Aff., ¶ 6; Vernon Aff., ¶ 9. They contacted Deputies Krise and Harris at 6:10 p.m. to assist with that task. Vernon Aff., ¶ 9. However, once Krise and Harris entered Perry's cell, Perry stopped yelling and kicking the walls, sat on a bench, and became quiet. Sanders Aff., ¶ 6; Vernon Aff., ¶ 9. Because Perry had calmed down, Sanders and Vernon decided to abort the attempt to place Perry in a restraint chair. Sanders Aff., ¶ 6. Krise and Harris subsequently left at 7:10 p.m. and contacted Lt. Beard to advise that Perry had taken his medication, calmed down, and that there were no further problems. Beard Aff., ¶ 3.

11

After Krise and Harris left the jail, Sanders and Vernon continued to monitor Perry for the remainder of their shift. Perry remained quiet during that time, sitting in his cell and talking to himself. Sanders Aff., ¶ 6; Vernon Aff., ¶ 9. Sometime that night, a female family member called and asked Sanders if Perry would be getting out soon. She suggested that Perry would be better off in a facility. Sanders told the caller to speak to the judge about getting Perry released to a facility. Sanders Aff., ¶ 6.

Officer Jon Scott ("Jon Scott") worked the next shift from 10:00 p.m. to 6:00 a.m. and learned that he needed to monitor Perry and give Perry his medication. Jon Scott Aff., ¶ 3. Jon Scott offered Perry his medication at 11:00 p.m., but Perry refused. *Id.* Jon Scott continued to check on Perry during his shift, and he and officer Joe Rady ("Rady") asked Perry two more times to take his medication; however, Perry did not want to take it. Jon Scott Aff., ¶ 4. Although Perry was not loud, he appeared oblivious to what Jon Scott and Rady were telling him. *Id.*

The next day, April 5, 2004, Jon Scott and Rady advised the morning shift that Perry had refused his medication. *Id.* The morning shift also offered Perry his medication and Perry once again refused. Clawson Aff., ¶ 7. Around 2:00 p.m., Vernon had to tell Perry to stop peeling paint from the cell walls with a juice carton. Vernon Aff., ¶ 10. Vernon then called Lt. Beard and asked if the jail officers could take Perry out of his cell and put him in a restraint chair in order to clean out the cell, which had become littered with crumpled sack lunches, crackers, and chips. *Id.* Lt. Beard gave Vernon permission to proceed and the jail officers placed Perry in a restraint chair while they cleaned out his cell. Vernon Aff., ¶ 10; Clawson Aff., ¶ 8.

Jack Schoettle ("Schoettle"), one of the officers who assisted with putting Perry in the restraint chair, had dealt with Perry in the past and had a good rapport with him. Schoettle Aff., ¶ 2.

12

He agreed to try to convince Perry to take his medication.  *Id.*  He asked Perry if Perry knew his name, and Perry responded "Jack, you old bald-headed man."  *Id.*  Schoettle then asked Perry if he would take his Valium "for me," and Perry agreed.  *Id.*  After initially spitting out the Valium, Perry ended up taking it along with three cups of water.  *Id.*  When Schoettle thanked Perry for taking the medication, Perry responded "any time." *Id.*  Schoettle oberved that Perry was talking to himself and making hand gestures, but Perry was not sweating, trembling, yelling, or screaming.  *Id.*

Thereafter, Vernon checked on Perry around 4:11 p.m. and saw that Perry was quiet and resting.  Vernon Aff., ¶ 11.  At 4:30 p.m., Vernon asked Perry to eat his dinner and Perry said that he would.  *Id.*  Vernon, along with Sanders, thought that Perry was doing much better on April 5 because he was not punching or hitting the wall and had settled down.  Sanders Aff., ¶ 8; Vernon Dep. at 29, 48.  Further, it appeared that Perry knew where he was, knew who the jailers were, and knew what was going on around him.  Sanders Aff., ¶ 8; Vernon Aff., ¶ 12; Vernon Dep. at 29.  Perry was also aware that it was April 5.  Vernon Dep. at 48-49.

Around 7:00 p.m., Vernon went into Perry's cell to collect Perry's dinner tray.  Perry had eaten part of the dinner and Vernon sat down to talk with Perry about how Perry was feeling.  Perry appeared to be calm, was not jittery or shaking, and was not making noises, kicking the walls, or clawing at the paint on the walls.  Vernon Dep. at 27-29, 46-48.  Thereafter, Vernon and Sanders visually checked on Perry roughly every fifteen minutes for a total of eight to ten times between 7:00 p.m. and 10:00 p.m.  Vernon Aff., ¶ 12; Sanders Aff., ¶ 8.  On each occasion, Perry was sitting quietly in his cell and there was nothing about his appearance that caused the officers concern or made them feel that he needed hospitalization or medical attention.  Sanders Aff., ¶ 8; Vernon Aff., ¶ 12.  The officers did notice that Perry had a few bruises, but when the checked them Perry denied

13

any pain in the areas and did not request any medial attention for them.  Sanders Aff., ¶ 8; Vernon Aff., ¶ 12; Vernon Dep. at 54-55.  Instead, Perry complained about pain on one of his sides, so Vernon checked the area; however, he did not see any visible marks and did not see Perry shaking, trembling, or displaying any tremors.  Vernon Aff., ¶ 12; Vernon Dep. at 47, 54-55.

After second shift ended on April 5, Sanders advised the third shift staff that Perry still needed to be monitored but that Perry was doing much better and appeared fine.  Sanders Aff., ¶ 8.  She also told third shift that Vernon had observed some bruises on Perry but that Perry did not need to go to the hospital for them.  Id.  The officers on the third shift that evening were Jon Scott and Rady.

Around 10:30 p.m. that evening, Jon Scott offered Perry his medication but Perry refused.  Jon Scott Aff., ¶ 5.  Jon Scott and Rady then monitored Perry that night, and Jon Scott went into Perry's cell to talk with Perry because he was worried about Perry and about Perry's continued refusal to take medication.  Id.  Around 2:15 a.m., Perry was once again offered his medication but did not respond with a yes or no.  Id.  Later, Jon Scott again entered the cell and noted that Perry was seated on the bench muttering.  Jon Scott Aff., ¶¶ 5-6.  Perry looked tired and Jon Scott told him that he needed to get some sleep.  Id.  Perry said that he would and lay down on the bench, but shortly after that Jon Scott saw Perry walking around the cell and muttering.  Id.  When third shift ended, Jon Scott advised the morning shift that he had offered Perry his medication but that Perry did not take it.  Id..

Jail officers Clawson and Sam Scott ("Sam Scott") worked the morning shift on April 6.  Both officers checked on Perry early in the shift and saw him asleep on the floor of the cell.  Clawson Aff., ¶ 9; Sam Scott Aff., ¶ 4.  Clawson specifically noted that Perry was breathing.

14

Clawson Aff., ¶ 9.  At 7:00 a.m., Sam Scott tried to get Perry to eat breakfast and take his medication but Perry refused by shaking his head and went back to sleep.   Sam Scott Aff., ¶ 4; Clawson Aff., ¶ 9.  Several other officers who arrived that morning saw or heard Perry breathing and saw him lying on the floor.  Schoettle Aff., ¶ 3; Beard Aff., ¶ 5; Naekl Aff., ¶ 3.  Clawson saw Perry adjust his sleeping position at 10:18 a.m., specifically rolling over and pulling a blanket over himself.  Clawson Aff., ¶ 9.  Other officers also saw Perry making movements between 10:00 a.m. and 11:00 a.m.  Hemmerling Aff., ¶ 3; Coffman Aff., ¶ 3; Sam Scott Aff., ¶ 4.

Sam Scott continued to watch Perry on the monitor until he left at 11:30 a.m.  Sam Scott Aff., ¶ 4.  Perry appeared to be sleeping at that time.  *Id.*  Jail officer Chris Pestow ("Pestow") arrived at the jail around 11:20 a.m. to fill in for Sam Scott.  Pestow ¶ 8.  He and Clawson began handing out lunches around 11:44 a.m.  *Id.*  When they opened Perry's cell at 11:47 a.m. and told him that lunch was ready, they saw no movement from Perry and Perry did not appear to be breathing.  *Id.*  Pestow checked Perry's wrist for a pulse and immediately requested that dispatch summon paramedics to the jail.  Pestow Aff., ¶ 8; Clawson Aff., ¶ 9.  Lt. Beard was also contacted and he observed Perry lying on his back on the opposite side of the cell from where he had been earlier in the morning.  Beard Aff., ¶¶ 5-6.  When the paramedics arrived at 11:58 a.m., they pronounced Perry dead at the scene.  *Id.*; Pestow Aff., ¶ 8; Clawson Aff., ¶ 9.

### C.  POST MORTEM EXAMINATION AND EXPERT MEDICAL OPINIONS

An autopsy performed after Perry's death indicated that the cause of death was alcohol withdrawal with contributing causes of dehydration, acute renal failure, and seizures.  Coroner's Rep.

& Autopsy Rep.; Frick Dep. at 57, 68-69.; Hatcher Dep. at 51, 82; Doolan Dep. at 109, 119, 123, 190.

Dr. Doolan believes that Perry did not have full blown DTs and that Perry's alcohol withdrawal would have been adequately treated with Valium had Perry taken his medication. Doolan Dep. at 172-73. Dr. Hatcher's assessment supports Dr. Doolan. Dr. Hatcher testified that symptoms of being agitated, incoherent, and fighting with imaginary persons and hallucinating in a cell are not necessarily indicative of DTs and do not necessarily require hospitalization absent tremors. Hatcher Dep. at 67-68, 71-72, 78.[2] In contrast, Dr. Frick asserts that Dr. Doolan's treatment was inadequate and that if Perry had been transported to the hospital and treated for DTs he would not have died. Frick Dep. at 55-56, 58-59,104-06, 113. However, even though Dr. Frick believes that the treatment was inadequate, even he agrees that the symptoms could indicate a condition other than the onset of DTs and that late stage DTs would involve marked tremulousness and visible shaking of the hands. Frick Dep. at 101, 106.

### III.  SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

---

[2] Just how bad Perry's condition was is disputed. Other detainees, for example, believed that Perry was in terrible shape. *See* Veach Decl., ¶¶ 12-16, 28-29; Mallo Decl., ¶ 5.

Summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003), *reh'g denied*. Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of

the suit in light of the substantive law will preclude summary judgment.  *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute.  *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party."  *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996), *cert. denied*, 519 U.S. 1115 (1997).

## IV.  DISCUSSION

### A.  CLAIMS AGAINST THE BRANNONS IN THEIR INDIVIDUAL CAPACITIES

As an initial matter, Plaintiffs have elected to forego their claims against Dennis M. Brannon and Teresa Brannon in their individual capacities.  *See* Pls.' Memo. in Resp. at 42 and 44.  Therefore, all claims against the Brannons are **DISMISSED with prejudice**, and the Brannons are dismissed as named defendants in this matter.

### B.  SECTION 1983 CLAIMS

Title 42 U.S.C. § 1983 creates a federal cause of action for "the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States."  *Spiegel v. Rabinovitz*, 121 F.3d 251, 254 (7th Cir), *cert. denied*, 522 U.S. 998 (1997).  Section 1983 is not itself a font for substantive rights; instead it acts as an instrument for vindicating federal rights conferred elsewhere.  *See id*.  Liability under § 1983 requires proof of two essential elements: that the conduct complained of (1) was committed by a person acting under color

of state law; and (2) deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *See Larsen v. City of Beloit*, 130 F.3d 1278, 1282 (7th Cir. 1997).

Plaintiffs raise several § 1983 claims. The Minor Children contend that the Sheriff and Dr. Doolan deprived them of "a liberty interest in continued familial relations" with Perry. The Estate contends that the Sheriff and Dr. Doolan failed to properly train jail officers and that Dr. Doolan was deliberately indifferent to Perry's medical needs. The Court addresses each of these claims in turn.

### 1.  Interference With Familial Relations

Defendants contend that the interference with familial relations claim is foreclosed by the Seventh Circuit's decision in *Russ v. Watts*, 414 F.3d 783, 791 (7th Cir. 2005), *reh'g and reh'g en banc denied*, which provided that no such claim is available in cases involving adult children. *See also Thompson v. City of Chicago*, 472 F.3d 444, 452 n. 25 (7th Cir. 2006) (noting that similar familial relations claim of victim's mother and wife was properly dismissed). Plaintiffs argue that the *Russ* court left the door open for minor children to assert such a claim because it explicitly recognized that the needs of minor children "warrant[] 'sharply different constitutional treatment.'" *Russ*, 414 F.3d at 790 (quoting *Butera v. District of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001); *McCurdy v. Dodd*, 352 F.3d 820, 829 (3d Cir. 2003)). The Court concludes that the claim should be dismissed.

First, it is doubtful whether a substantive claim for interference with familial relations even exists under § 1983. The *Russ* court was certainly careful not to explicitly recognize such a right, and this Court is unaware of any current decision of the Seventh Circuit recognizing such a right.

In fact, at least one Circuit Court has rejected such an argument. *See Shaw v. Stroud*, 13 F.3d 791, 805 (4th Cir. 1994). In doing so, the *Shaw* court noted that the Supreme Court "has never held that the protections of substantive due process extend to claims based on governmental action which affects the family relationship only incidentally." *Id.* (citations omitted). Indeed, that the Supreme Court would recognize such a right where the effect is merely incidental seems unlikely given that it has held that negligent infliction of harm is not actionable under § 1983. *See Daniels v. Williams*, 474 U.S. 327, 330-31 (1986).

Further, where the claim has been recognized, it often arises in the context of circumstances implicating procedural due process, such as cases where a state attempts to separate a parent from a child without due process of law to protect the parent's liberty interests. *See Russ*, 414 F.3d at 786 (citing *Bell v. City of Milwaukee*, 746 F.2d 1205, 1243-44 (7th Cir. 1984)). Historically, the claim has been limited to situations where the state action is aimed at the relationship, *i.e.*, where the action is deliberate. *See id.* at 788-89 (citing *Daniels*, 474 U.S. at 331); *see also id.* at 790 (collecting cases); *Thompson*, 472 F.3d at 452 n. 25 (noting that plaintiffs lacked standing to raise such a claim under § 1983 because they had not alleged that the victim was killed "for the specific purpose of terminating [the victim's] relationship with his family").

As the *Russ* court recognized, finding a constitutional violation based on official actions that were not aimed at the familial relationship inappropriately stretches due process "far beyond the guiding principles set forth by the Supreme Court." *Russ*, 414 F.3d at 789-90. Here, Plaintiffs have not presented any evidence, much less even alleged, that the actions of the Defendants were

20

specifically directed at disrupting the familial relationship.  Accordingly, the Court **GRANTS** both of the requests for summary judgment on this claim and **DISMISSES** the same **with prejudice**

### 2. <u>Failure To Train</u>

The Court turns to the question of whether Defendants are entitled to summary judgment on the Estate's failure to train claim.  Failure to train is a theory normally reserved for municipal liability claims.  Thus, it is unclear how this claim applies to Dr. Doolan, particularly when he was not responsible for writing or implementing the policies and procedures at the jail.  Moreover, there is no evidence that he had any dominion or control over the jail officers, so he could not force any officers to attend training or sanction them for not attending.  Therefore, the Court sees no basis for the claim as it pertains to Dr. Doolan.

Even if such a claim could be raised against Dr. Doolan, it would be evaluated using the same standards that apply to the Sheriff.  A government entity cannot be held liable under § 1983 on a *respondeat superior* theory.  *See Latuszkin v. City of Chicago*, 250 F.3d 502, 504 (7th Cir. 2001).  Instead, the Estate must prove that: (1) Perry suffered a deprivation of a federal right (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority (3) which was the proximate cause of Perry's death.  *See Monell v. N.Y. City Dep't of Soc. Serv.*, 436 U.S. 658, 690-91 (1978); *Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir.2000).  The Estate could only prevail on its claim if the failure to train amounted to "deliberate indifference" to Perry's rights.  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  Further, the Estate would have to show that the Defendants had actual or constructive knowledge that such a failure to train would likely result in constitutional deprivations.

*See Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997). This could be accomplished by presenting evidence of a pattern of constitutional violations, or where a clear constitutional duty is implicated in recurrent situations that a particular officer is likely to face. *Id.* Thus, the following test is useful in making that showing: (1) the training provided to jail officers was, in fact, inadequate; (2) the Defendants are culpable because they were faced with an obvious need for training and consciously chose not to provide adequate training; and (3) the Defendants' choice not to provide adequate training was the "moving force" behind the alleged constitutional deprivations. *See Kindle v. City of Harvey*, No. 00 C 6886, 2002 WL 230779, *3 (N.D. Ill. Feb. 15, 2002) (citing *Monell*, 436 U.S. at 694).

Here, the Estate has failed to make a showing that Defendants should be liable under a failure to train theory. The undisputed evidence shows that all jail officers hired by the Sheriff were required to take the training course offered by the Indiana Law Enforcement Academy and become certified as jail officers. Brannon Aff., ¶ 6. Jail officers also received on-the-job training in such matters as administering medication, CPR, and triage of detainees. Brannon Aff., ¶ 6; Doolan Dep. at 19, 28-29; Teresa Brannon Dep. at 12-14. These facts negate any inference that the Defendants were deliberately indifferent to training needs. *See, e.g.*, *Tapia v. City of Greenwood*, 965 F.2d 336, 339 (7th Cir. 1992) (noting that SWAT team's unconstitutional entry into home could not be said to have been done pursuant to official policy where officers attended training academies and had training on warrants).

Moreover, prior to Perry's death, there is no evidence that any detainee had died or sustained serious injury from a failure to secure medical attention, including complications arising from alcohol withdrawal or dehydration. Brannon Aff., ¶ 5. In that respect, this case is similar to the

circumstances in *Hirsch v. Burke*, 40 F.3d 900 (7th Cir. 1994). There, a diabetic detainee suffered insulin shock and died at a jail. Similar to the claim in the case at bar, the plaintiff in that case claimed that the municipality failed to adequately train its officers to recognize and distinguish the symptoms of diabetes from those of intoxication. Because there was no evidence that the defendants were on notice of any pattern of similar violations resulting from inadequate training, plaintiff's failure to train theory failed. *See id.* at 904-05. The Seventh Circuit concluded that, at most, the case was one of simple negligence, which is insufficient to establish a § 1983 claim. *See id.* at 905. *See also Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997) (rejecting argument that specialized training was necessary because it is contrary to "better or more" training scenarios that are insufficient to establish a failure to train theory).

The Estate's argument is similar to those rejected in *Hirsch* and other cases. The Estate is really arguing one of two things: that the jail officers should have received specific or better training on recognizing the symptoms of DTs, or that they were negligent in following the policy that was already in place. Either way, the Estate's argument must fail. Specifically, there is no evidence that the Defendants were on notice that the training provided to the jail officers was deficient and that the Defendants consciously chose not to provide adequate training. Absent such evidence, the failure to train claim must fail. Therefore, Defendants' motions for summary judgment on this claim are **GRANTED** and the failure to train claim is **DISMISSED with prejudice**.

23

### 3. <u>Deliberate Indifference to Medical Needs</u>

Plaintiffs also allege that Dr. Doolan was deliberately indifferent to Perry's medical needs.[3] Dr. Doolan denies the allegation and contends that he is entitled to qualified immunity on the claim. Therefore, before addressing the merits of the claim, the Court must first consider Dr. Doolan's assertion that he is entitled to qualified immunity, which is an "'entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The privilege is "'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Id*. at 200-01 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in original). As a result, the Supreme Court has stressed the importance of resolving immunity questions at the earliest stage of litigation. *Id*. at 201.

As an initial matter, there is a question of whether Dr. Doolan is even entitled to assert a defense of qualified immunity. Evidence suggests that Dr. Doolan was a private contractor. Seizing on this circumstance, Plaintiffs cite to and rely upon the Supreme Court's decision in *Richardson v. McKnight*, 521 U.S. 399, 408-09 (1997), which found that private prison guards were not entitled to use the defense of qualified immunity. Plaintiffs reason that Dr. Doolan should similarly be barred from asserting the defense of qualified immunity because he is a private contractor and not a government official. However, the Supreme Court specifically indicated in *Richardson* that it was addressing the immunity question narrowly in the context in which it arose and emphasized that the context did not "involve a private individual briefly associated with a government body, serving as

---

[3] Because Plaintiffs have limited their arguments against the Sheriff to the failure to train claim, the Court concludes that Plaintiffs are not making a claim of deliberate indifference against the Sheriff.

an adjunct to government in an essential governmental activity, or acting under close official supervision." *Richardson*, 521 U.S. at 413.  Thus, it is clear that the Supreme Court has not shut the door on the use of the defense by private individuals in all cases.  *See also Malinowski v. DeLuca*, 177 F.3d at 623, 627 (7th Cir. 1999) (concluding that immunity was unwarranted where facts revealed that private entities carried out their duties largely without government supervision or direction); *cf. Sherman v. Four County Counseling Ctr.*, 987 F.2d 397, 405-06 (7th Cir. 1993) (concluding that private hospital could raise the defense where it treated patient pursuant to court order).

Here, Dr. Doolan might be able to construct a convincing argument that he should be entitled to assert the defense of qualified immunity.  He was hired to assist the Sheriff in fulfilling the Sheriff's obligation to care for the detainees in the Sheriff's possession.  As such, Dr. Doolan might fit within the narrow exception to the general rule that qualified immunity is reserved for government officials.  However, the Court need not explicitly resolve this issue because, as explained below, even assuming that Dr. Doolan is entitled to assert the defense it would fail.

In addressing the qualified immunity issue, a court's initial inquiry must be whether, taken in the light most favorable to the nonmovant (in this case, the Plaintiffs), the facts alleged show that Dr. Doolan's conduct violated a constitutional right.  *Id*.  If a violation could be established on a favorable view of the facts, the next step is to ask whether the right was clearly established.  This inquiry must be undertaken "in light of the specific context of the case, not as a broad general proposition."  *Id*.  In addition, the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id*. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).  The

absence of case law that is "precisely on all fours on the facts and law involved" does not mean that a defendant is entitled to qualified immunity. *See Anderson v. Creighton,* 483 U.S. 636. 640 (1987); *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994) (citation omitted).  Rather, the Court must determine whether the unlawfulness of the conduct was readily apparent in light of pre-existing law. *See Anderson*, 483 U.S. at 640.  The Court must not make this determination too abstractly because "government employees must obey the law in force at the time but need not predict its evolution . . . ." *Kernats,* 35 F.3d at 1176 ( quoting *Greenberg v. Kmetko*, 922 F.2d 382, 385 (7th Cir. 1991)).

Turning to the fact in the case at bar, although Dr. Doolan disputes it, a pretrial detainee's right to receive reasonable and adequate attention for a serious medical condition was well-established at the time of Perry's death.  That circumstance alone defeats Dr. Doolan's argument on qualified immunity.  The Court is unpersuaded by Dr. Doolan's attempt to obfuscate the issue by arguing that no case has specifically indicated that certain treatment is required for an individual experiencing alcohol withdrawal.  While that might be true, it misses the mark; what matters is whether Dr. Doolan rendered appropriate care for Perry's medical needs based on the information available to Dr. Doolan.  Answering that question requires a consideration of the merits of the claim.

Having found that the defense is unavailable, the Court must now determine whether Dr. Doolan is nonetheless entitled to judgment on the merits of the claim or whether there are any factual disputes that preclude an entry of summary judgment.  To establish a claim arising out of the denial of or interference with medical care, Plaintiffs must prove "deliberate indifference to [Perry's]

serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).[4]  "Deliberate indifference"

means the "unnecessary and wanton infliction of pain." *Id.* at 104 (citing *Gregg v. Georgia*, 428

U.S. 153, 157 (1976)).  The test for considering such claims contains both an objective and

subjective element.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  In order to satisfy the

objective component, "the deprivation must be, objectively, 'sufficiently serious.'" *Id.* (quoting

*Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  A prison official's actions must result in the denial of

"'the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes v. Chapman*, 452 U.S.

337, 347 (1981)).  The subjective component requires a showing that the prison official knew of a

substantial risk of serious injury to the prisoner but nevertheless failed to take reasonable measures

to prevent harm from occurring.  *See Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999).  In

addition, "[t]he officials must know of and disregard an excessive risk to inmate health; indeed they

must 'both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists' and 'must also draw the inference.'" *Greeno v. Daley*, 414 F.3rd 645, 653 (7th

Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  However, neither medical

malpractice nor differences in opinion over medical judgment on appropriate treatment amounts to

deliberate indifference.  *See Estelle*, 429 U.S. at 106-07.

There does not appear to be any dispute that the objective prong is satisfied.  Several cases

have recognized the seriousness of alcohol withdrawal that produces DTs and can result in death.

---

[4]  Technically, because he was not a prisoner but a pretrial detainee, Perry was protected under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n. 16 (1979)).  However, in determining whether Perry's rights were violated, the analysis is identical to that applied under the Eighth Amendment. *See, e.g.*, *Barrie v. Grand County*, 119 F.3d 862, 868 (10th Cir. 1997); *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).

*See, e.g.*, *Speers v. County of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006) (unpublished decision); *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001); *Lancaster v. Monroe County*, 116 F.3d 1419, 1425-26 (11th Cir. 1997); *Morrison v. Washington County*, 700 F.2d 678, 686 (11th Cir. 1983).  *See also Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999) (stating that "[a] condition is objectively serious if 'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'") (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)).  The real issue is centered on the subjective component of the test.

Having reviewed the evidence presented by the parties, the Court concludes that questions of fact preclude granting Dr. Doolan's motion for summary judgment on the deliberate indifference claim.  Dr. Doolan admits that DTs is a serious condition if not properly treated.  Doolan Dep. at 90. Further, he has characterized some of the comments of the jail offices regarding Perry's condition as damning and indicated that Perry should have been hospitalized.  Doolan Dep. at 65, 67-69, 103-11, 137.  Finally, although Dr. Doolan denies it, there is evidence that the jail officers informed Dr. Doolan of Perry's condition.  Doolan Dep. at 50, 53-54, 67-69, 103-10, 117-18; Rolston Dep. at 33; Vernon Dep. at 20-21, 45, 52, 65-66.  Thus, the evidence is conflicting about what information Dr. Doolan had regarding Perry's condition.  Based on that evidence, a jury could reasonably conclude that this case goes beyond simple medical malpractice or a disagreement over medical judgment on appropriate treatment.  Specifically, a reasonable jury could find that Dr. Doolan was actually aware of Perry's condition and, because he did not have Perry hospitalized, infer that Dr. Doolan deliberately chose not to order hospitalization.  Therefore, Dr. Doolan's request for summary judgment on the deliberate indifference claim must be, and therefore is, **DENIED**.

## C.  STATE LAW CLAIMS

Plaintiffs raise state laws of wrongful death and negligence against the Sheriff and Dr. Doolan.  The Court addresses the state claims against each of the remaining defendants in turn.

With respect to Dr. Doolan, the state law claims essentially boil down to claims of medical malpractice, *i.e.*, that Dr. Doolan failed to provide the proper care for Perry and that Perry died as a result.  Indiana law requires plaintiffs to submit such claims to a review panel before filing suit.  *See* Ind. Code § 34-18-8-4.  There is no indication that this has been done.  In fact, in response to Dr. Doolan's argument on this point, Plaintiffs essentially concede that they have not submitted the claims to a review panel by first urging the Court to exercise supplemental jurisdiction and then suggesting that the claims be stayed until they have exhausted administrative remedies.  This case has been pending for some time; therefore, the Court declines the Plaintiffs' suggestion to the state law claims that should have been presented to a review panel.  Instead, the Court opts for dismissal of the state law claims against Dr. Doolan, and those claims are now **DISMISSED without prejudice**.

Unlike Dr. Doolan, the Sheriff cannot rely upon the Medical Malpractice Act.  Instead, the Sheriff offers two arguments for dismissing the state law claims.  First, the Sheriff contends that the Court should decline to exercise jurisdiction over the state law claims because the § 1983 claims are deficient.  However, the Court concludes that retaining the state law claims against the Sheriff is more efficient because those claims arise from the same nucleus of facts as the remaining § 1983 claim against Dr. Doolan.  Therefore, the Court is unpersuaded by the Sheriff's first argument for dismissal of the state law claims.

29

The Sheriff's second argument is that the state law claims should be dismissed because Perry was contributorily negligent by getting drunk and then refusing medication. With respect to the fact that Perry was intoxicated at the time of his arrest, the Court concludes that the defense of contributory negligence is unavailable to the Sheriff. It is a long-standing principle in Indiana tort law that tortfeasor takes a victim as he finds him. *See Bemenderfer v. Williams*, 745 N.E.2d 212, 218 (Ind. 2001). Moreover, the Sheriff had a duty under Indiana law to take reasonable steps under the circumstances to preserve the life, health, and safety of Perry. *See Sauders v. County of Steuben*, 693 N.E.2d 16, 18 (Ind. 1998). Finally, arguments similar to the Sheriff's have been explicitly rejected in the context of medical malpractice cases. *See, e.g.*, *Cavens v. Zaberdac*, 849 N.E.2d 526, 530 (Ind. 2006) (concluding that health care provider could not introduce evidence of patient's pre-treatment negligence of excessive use of medication and delay in seeking treatment to prove contributory negligence); *Ripple v. Day*, 862 N.E.2d 7, 2007 WL 506513, * 4-5 (Ind. Ct. App. Feb. 19, 2007) (unpublished decision) (finding no abuse of discretion in excluding evidence of prior methamphetamine use that party offered, in part, for defense of contributory negligence), *trans. denied*. These cases are compelling because, like the Sheriff, a health care provider is obligated to treat his or her patients with reasonable care regardless of the condition in which the patient presents himself or himself. Therefore, in light of the foregoing circumstances, the Court finds that the Sheriff may not use Perry's intoxication as evidence of contributory negligence.

Although the Sheriff may not use Perry's intoxication for a defense of contributory negligence, a closer question is presented on the claim that Perry refused medication. Again, drawing from medical malpractice cases, the Court notes that the failure to heed a health care provider's advice may be introduced to prove contributory negligence. *See, e.g.*, *Smith v. Hull*, 659

30

N.E.2d 185, 191-92 (Ind. Ct. App. 1995). *But see Sawlani v. Mills*, 830 N.E.2d 932, 943 (Ind. Ct. App. 2005) (concluding that post-treatment negligence that was wholly subsequent to defendant's negligent act warranted an instruction on mitigating damage rather than contributory negligence instruction). Thus, the Court concludes that the Sheriff probably could, at least in theory, present evidence of a refusal to take medication to support a defense of contributory negligence. Granting summary judgment on this point, however, is a different matter. While the evidence permits an inference that Perry refused medication, it is equally plausible that a jury could conclude that Perry was not making a conscious choice to refuse medication. Specifically, there is evidence suggesting that Perry was intoxicated, undergoing alcohol withdrawal, and was incoherent and hallucinating. Thus, a jury could conclude that Perry did not actually refuse medication and, therefore, that he was not contributorily negligent. Because it would be inappropriate for this Court to invade the province of the jury and make that decision, the Court cannot grant the Sheriff's request for summary judgment on the state law claims.

## V. <u>CONCLUSION</u>

Based on the foregoing, the Motion for Summary Judgment filed by Defendants Boone County Sheriff, Boone County Jail Commander Teresa Brannon, and Sheriff Dennis M. Brannon (Docket No. 63) is **GRANTED in part and DENIED in part**. The claims against Boone County Jail Commander Teresa Brannon and Sheriff Dennis M. Brannon are **DISMISSED with prejudice** and they are dismissed as named defendants in this matter. Further, Plaintiffs' section 1983 claims against the Boone County Sheriff are **DISMISSED with prejudice**. Only Plaintiffs' state law claims remain against the Boone County Sheriff.

In addition, the Motion for Summary Judgment filed by Defendant Doctor Patrick Doolan (Docket No. 66) is **GRANTED in part and DENIED in part**.  Plaintiffs' section 1983 claims against Doctor Doolan for deprivation of "a liberty interest in continued familial relations" and for failure to train are **DISMISSED with prejudice**.  Further, the state law claims against Dr. Doolan are **DISMISSED without prejudice**.  Only Plaintiffs' section 1983 claim for deliberate indifference to Brian Perry's medical condition remains against Dr. Doolan.

IT IS SO ORDERED this 12th day of March, 2008.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


**Electronically distributed to:**

David Robert Brimm
WAPLES & HANGER
dbrimm@wapleshanger.com

Jaunae M. Hanger
WAPLES & HANGER
hangerj@iquest.net

David J. Mallon JR
ICE MILLER LLP
mallon@icemiller.com

Kelly J. Pitcher
ICE MILLER LLP
kelly.pitcher@icemiller.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Richard A. Waples
WAPLES & HANGER
richwaples@aol.com